UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| SIEMENS ENERGY, INC. and PROGRESSIVE RAIL, INC., <br><br> Plaintiffs, <br><br> V. <br><br> CSX TRANSPORTATION, INC., <br><br> Defendant. | Civil No. 3:15-cv-00018-GFVT-EBA <br><br><br> **MEMORANDUM OPINION** <br> **&** <br> **ORDER** |

\*\*\* \*\*\* \*\*\* \*\*\*

This is a shipping and transportation case brought by Plaintiffs seeking to recover for damages to two electrical transformers, which were allegedly damaged during rail shipment by Defendant CSX Transportation, Inc. from Baltimore, Maryland, to Ghent, Kentucky. Presently before the Court are cross-motions for summary judgment, filed by Defendant CSX and Plaintiff Siemens Energy, Inc. [R. 94; R. 96.] Pursuant to this Court's previous Order [R. 66], the motions and attendant briefing address only the limitation of liability issue. The difference in opinion on this issue can be wholly resolved by properly characterizing the various documents related to the shipping arrangement, with two documents in particular carrying the most import. For the reasons stated below, the Court **GRANTS** the Defendant's Motion for Summary Judgment and **DENIES** the Plaintiff Siemens Energy's Motion for Partial Summary Judgment.

**I**

"A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 19 (2004). The present limitation of liability issue

centers around the effect of several documents, including certain bills of lading, which served to coordinate the transportation of two electrical transformers. This established, the factual background in this case, although only involving the sale and transportation of two transformers, is complicated by the numerous business entities involved, their relationships to each other, and the numerous documents and emails exchanged over the course of the transportation process.

In 2011, Siemens Energy, the wholly-owned United States affiliate of Siemens AG, agreed to sell two electrical transformers to Gallatin Steel, located in Ghent, Kentucky. [R. 95-2 at 140; *id.* at 11-14.] The transformers are manufactured in Germany by Siemens AG and, as such, the two Siemens entities begin to plan their delivery from Germany to Ghent. [R. 94-1 at 3–4; R. 96-1 at 1–2.] Siemens AG "evaluat[ed] all offers for transportation" and retained German freight forwarder Kuehne + Nagel, AG & Co. (K+N AG) to make the necessary arrangements. [R. 94-2; R. 96-1 at 4–5.]

As part of the arrangements made between Siemens AG and K+N AG, Blue Anchor Line, an arm of K+N AG, issued two initial bills of lading for the transformers, reflecting that Siemens AG was the shipper and Siemens Energy was the consignee.[1] [R. 96-1 at 2; R. 96-9.] Notably, these initial bills of lading listed Ghent, KY within a box titled "Place of Delivery (Multimodal Transport only)," and, further, included Gallatin Steel as a party to be notified.[2] [R. 96-9; R. 94-3.] For purposes of clarity, these initial bills of lading, identical in their terms and

---

[1] Technically, Siemens Energy purchased the transformers from its parent company, Siemens AG, with title transferring to Siemens Energy upon the transformers' arrival in the U.S. [*See* R. 96-1 at 1 fn. 1; R. 95-4 at 6.]

[2] The parties' briefing evidences a factual discrepancy, as CSX references two initial bills of lading [R. 94-1 at 5], whereas Siemens' briefing only refers to one initial bill of lading—notably, one of the two referenced by CSX. [R. 96 -1 at 7.] The two bills of lading introduced by CSX contain identical terms to each other. [*See* R. 94-3.] Because the present dispute centers upon whether these initial documents were intended to cover the entirety of the shipment, from start to finish, not whether the two transformers were shipped separate from the other, this discrepancy is ultimately insignificant.

issue date, will be referred to singularly, as the Blue Anchor bill, from this point forward.

As relevant to the present issues before the Court, the Blue Anchor bill contained three provisions which touched on the potential liability of the parties. First, the "Clause Paramount." Located within the "Carrier's Liability" section, this provision provided that the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701, Note § 1(a), was to apply for the entire journey, "as long as the Goods remain the custody of the Carrier or its Sub-Contractor."[3] [*See* R. 94-3.] The bill also included two provisions that further limited the liability of certain parties, a "Himalaya Clause" and a "Covenant Not to Sue." The Himalaya Clause extended the bill's limitation of liability provisions to subcontracting parties that ultimately performed services contemplated by the bill. *Id.* The Covenant Not to Sue provided that the Merchant, which included both Siemens AG and Siemens Energy, agreed "that no claim or allegation shall be made against any Sub-Contractor whatsoever" in connection with transportation of the transformers. *Id.*

Subsequent to issuance of the Blue Anchor bill, K+N AG contracted with Kawasaki Kaishen Kiasha, Ltd. ("K-Line") to complete the ocean leg of the transportation. [R. 94-1 at 9; R. 96-1 at 7–8.] Prior to the journey, K-Line issued a separate waybill[4] relating solely to the ocean leg. [R. 96-1 at 7–8.] This K-Line waybill specifically referenced the Blue Anchor bill as the "applicable Bill of Lading." [R. 96-7; R. 95-3 at 63–64.]

After the ocean leg of the transportation was arranged, K+N AG's U.S. counterpart, K+N

---

[3] In the bill, the term "Carrier" was defined as Blue Anchor and the term "Carrier's Agents" was defined to include the K+N company that arranged the Carriage (K+N AG) and the K+N company in the country where the goods were discharged (K+N Inc.). [R. 94-3.]

[4] Similar to a bill of lading, a "waybill" is "a document that is prepared by the carrier . . . transporting a shipment of goods, that contains such information as the nature of the shipment, the name of its consignor and consignee, its origin, route, destination . . . .." *Webster's Third New International Dictionary* 2588 (1976).

Inc., began to arrange for the inland portion of transportation via rail to Ghent. [R. 94-1 at 10–11; R. 96-1 at 8–11.] To do so, K+N Inc. approached Progressive Rail to obtain quotes. [R. 96-1 at 8–10.] Following responses from both CSX and Norfolk Southern Railroad Company, Progressive Rail provided K+N Inc. with various quotes and K+N Inc. "settled on the move via direct shipment by CSXT." [*Id.* at 10; R. 99 at 3–5.] K+N Inc. was in contact with Siemens Energy throughout this process and, after reviewing the price quotes, Siemens Energy agreed to the arrangement with CSX, as facilitated by K+N Inc. and Progressive Rail. [R. 96-1 at 9–11. Progressive Rail then prepared a bill of lading covering rail shipment which designated Progressive Rail as the shipper and Gallatin Steel as the consignee. [R. 96-8.] This bill of lading did "not make any reference whatsoever to the application of any limitations of liability" or other pertinent documents. [R. 96-1 at 11; R. 96-8.]

In line with the above arrangements, K-Line transported the transformers from Germany to the United States, specifically Baltimore, Maryland, aboard the M/V CALIFORNIA HIGHWAY, which arrived stateside on August 13, 2012. [R. 96-1 at 2.] CSX received the transformers on August 31, 2012 and transported them from Baltimore to Ghent, Kentucky, where they arrived on September 20, 2012. *Id.*

This lawsuit arises from the Baltimore to Ghent leg of the shipment. Siemens Energy claims that the transformers were found to be in good condition upon arrival to Baltimore and sustained damaged during the rail transportation by CSX to Ghent, with one transformer damaged to the extent that it had to be returned to Germany for repairs at Siemens AG. [*Id.* at 3; R. 52 at 2–3.] According to Siemens Energy, it sustained losses estimated at approximately $1,555,824.60 for costs in transporting, inspecting, repairing, and storing the transformers. [R. 52 at 4–5.] Siemens Energy now seeks to recover for those alleged losses, notwithstanding

4

CSX's claims that its liability is limited.

## II

### A

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Here, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

When applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Anderson*, 477 U.S. at 255). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id*.

### B

A "through" bill of lading is a device by which cargo owners, like Siemens AG, "can contract for transportation across oceans and to inland destination in a single transaction." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25–26 (2004) (citations omitted). The threshold question in this case is whether the Blue Anchor bill, issued as part of the initial arrangements between Siemens AG and K+N AG, is a through bill. Only after this question is resolved can it then be determined whether CSX is entitled to limitation of liability via that bill's provisions.

CSX argues that the Blue Anchor bill is clearly a through bill of lading. As such, pursuant to recent Supreme Court precedent, CSX contends that it, as a subcontracting carrier, "is entitled to rely on [that] bill as the contract for carriage" and thereby limit its liability, if any, in accordance with the Blue Anchor bill's favorable provisions. [R. 94-1 at 21.] On the other hand, Siemens Energy argues that the Blue Anchor bill was not a through bill of lading and, therefore, CSX cannot limit its liability based on the terms of that document. [R. 94-1 at 39.]

### 1

Prior to the Supreme Court's 2006 decision in *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, courts treated the question of whether a bill of lading constituted a through bill as

"predominantly a question of fact." *Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 394 (7th Cir. 1992). CSX now contends that the Supreme Court's holdings in *Kirby* and *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89 (2010), warrant a different analysis. [R. 98 at 13 fn. 17.] Indeed, the Sixth Circuit has noted that certain case law in this area of law is now of "limited value," where it "predated *Kirby* and *[Regal-Beloit]*." *CNA Ins. Co. v. Hyundai Merch. Marine Co.*, 747 F.3d 339, 366 (6th Cir. 2014). However, the Court does not read these Supreme Court opinions to completely change the inquiry concerning what is and is not a through bill.[5] In both *Kirby* and *Regal-Beloit*, the Supreme Court considered the effect and scope of through bills, not whether the bills of lading were in fact through bills. *See Kirby*, 543 U.S. at 30–36; *Regal-Beloit*, 561 U.S. at 93. Indeed, in both cases, the issue of whether the bills of lading were through bills was not at all heavily contested.

One portion of the Court's opinion in *Regal-Beloit*, however, warrants further review as it concerns the present "through bill determination." In that case, the Court analyzed the interaction between the provisions of a through bill and a subsequently issued bill of lading and, in view of the respective bills, determined the applicable law. *See* 561 U.S. at 99–110. As relevant here, the Court held that subsequent issuance of a separate, domestic bill of lading did not change the terms or impact of the through bill. *Id.* at 106–07. In reaching this holding, the Court specifically noted that it was possible that a carrier or subcontractor may unnecessarily issue the separate, domestic bill of lading. *Id.* at 103–04. While this reasoning did not directly concern the "through bill determination," it does limit the value of a factor many courts have considered as part of this determination: whether a separate domestic bill of lading was issued.

---

[5] That said, the *Kirby* and *Regal-Beloit* holdings, which discuss more generally the effect and purpose of through bills, provide guidance as it relates to the present inquiry. Accordingly, the Court's final determination in this case is necessarily influenced by the reasoning and principles relied upon by the Supreme Court in those factually similar cases.

*See G & P Trucking Co. v. Zurich Am. Ins. Co.*, 123 F. Supp. 3d 804, 808 (D.S.C. 2015) (reaching the same conclusion). In sum, because the issuance of a subsequent domestic bill of lading may have been unnecessary, the existence of such a bill should not bear on the scope or effect of a previously issued bill of lading.

Casting this factor aside, courts have generally looked to three relevant factors to determine whether a bill of lading is a through bill. These three factors are as follows: (1) the final destination designated on the bill, (2) the conduct of the relevant parties, including the shipper, intermediaries, and the carriers, and (3) the method by which the connecting carriers were compensated. *See Marine Office of Am. Corp. v. NYK Lines*, 638 F. Supp. 393, 399 (N.D. Ill. 1985) (citing *S.C. Johnson v. Louisville & Nashville Railroad Co.*, 695 F.2d 253, 257 (7th Cir. 1982)). Consideration of these factors will assist the Court in determining whether a particular bill of lading covered the entirety of the transportation (a through bill) or, conversely, whether the transportation was broken in two separate legs such that the initial bill of lading was not a through bill.

### 2

### a

The first factor, the final destination designated on the through bill, is easily resolved in favor of a determination that Blue Anchor bill is a through bill. The bill includes a box entitled "Place of Delivery (Multimodal Transport only)." [R. 94-3.] The entry in that box is clearly listed as "Ghent, KY." *Id.* Moreover, everything within the Blue Anchor bill itself expressly indicates that it is a through bill, as that term has been defined by the Supreme Court. *Kirby*, 543 U.S. at 25–26. First, as recognized by numerous courts, "multimodal transport" means transport by more than one mode of transportation, for example, by both ship and rail. *Kirby*, 543 U.S. at

25; *Helvetia Swiss Ins. Co. v. Jones*, No. CV 3:16-1447, 2018 WL 4492814, at *8 (M.D. Pa. Sept. 19, 2018). Second, in the bill, the "port of loading" is listed as Bremerhaven, a port in Germany. [R. 94-3.] Logically, as the first leg of the journey was by sea, not air, this bill of lading contemplated two modes of transportation, by sea and by another mode of transportation upon arrival in the United States. "[T]he parties must have anticipated that a land carrier's services would be necessary for the contract's performance." *Kirby*, 5433 U.S. at 32. Review of the Blue Anchor bill itself indicates that it is a through bill.[6]

### b

Consideration of the closely related second and third factors, the conduct of the relevant parties and the method by which the connecting carriers are compensated, results in a more involved analysis. However, the analysis ultimately points towards the same result as the first factor.

As part of this analysis, the Court will consider, necessarily, the relationships between the entities that paid for and received payment. To this point, Siemens Energy focuses considerable attention on the technical distinctions between different business entities and, relatedly, how each portion of the delivery was arranged by those entities. [*See* R. 100 at 2 ("CSX[] has comingled the identity of the separate entities involved in each portion of the move as if they had acted as one, thereby disregarding the corporate separateness each entity has, and the separate undertakings each assumed in this case.").] Similarly, Siemens Energy points to portions of the record which show that the ocean leg and rail leg of the transport were paid for separately. [R. 95-2 at 47–49; R. 96-6.] As to these factual contentions, the Court acknowledges

---

[6] Siemens Energy contests the effect of the Blue Anchor bill, arguing that it does not reflect the intent of the parties. However, Siemens Energy fails to introduce any evidence in support of its conclusory statements that the reference to Ghent in the bill was in error. [*See* R. 94-1 at 38.]

9

that the following series of events is true: Siemens AG contracted with K+N AG (both German entities), who then contracted with K-Line for the ocean leg of the delivery; Siemens Energy contracted with K+N Inc. (both U.S. entities), who then contracted with Progressive Rail and, ultimately, CSX for the rail leg of the delivery in the U.S.

The Court notes that the following is also true. Siemens Energy is a wholly-owned subsidiary of Siemens AG. [R. 95-2 at 140; 95-4 at 6.] Likewise, K+N AG, K+N, Inc., and Blue Anchor, are wholly owned by K+N International AG. [*See* R. 94-1 at 4 fn. 6; R. 96-1 at 5.] Moreover, although Siemens Energy was kept apprised of the negotiations with carriers, it cannot contest that K+N entities facilitated the entire delivery. [*See* R. 95-2 at 72.] To focus, as Siemens Energy desires, on the technical differences between the entities would ignore the true integrated approach with which the Siemens entities approached the sale of the transformers and with which the K+N entities approached the transportation arrangement. [*See* R. 95-4 at 6 (acknowledging that Siemens AG is the "mothership" and "global headquarters" as it relates to the Siemens entities).] Moreover, such a focus would cast a blind eye to the nature of wholly-owned subsidiaries generally. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate . . .. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver.").

The evidence introduced both by CSX and Siemens Energy supports a conclusion that the Siemens entities and K+N entities worked in concert on this transportation arrangement. First, shortly after reaching an initial agreement with K+N AG, a Siemens AG employee emailed a Siemens Energy employee stating: "After evaluating all offers for transportation we intend to go ahead with Kuehne+Nagel for [sic] *full scope* from EXW Dresden [Germany] to DAP Ghent

[Kentucky] site." [R. 94-2.] Siemens Energy contends this line of the email does not show the entire story. [R. 100 at 3–4.] It points out that, within the same email, after noting that Kuehne+Nagel[7] was the choice for transportation of the transformers, the Siemens AG employee clarified that the separate "parts" of the transportation needed to be "ordered" separately by "Siemens Germany" and "Siemens US." [*Id.* (citing R. 95-2).] A plain reading of the email as a whole, however, simply shows that after a decision was made by Siemens AG (headquarters) in Germany to "go ahead with Kuehne+Nagel," it then directed Siemens Energy to formally order the U.S. portion of the transportation. [R. 95-2.]

Siemens Energy also points to the fact that Blue Anchor, who issued the Blue Anchor bill, was not involved with the rail leg of the transportation. Specifically, it notes that Blue Anchor did not deal with the movement of the transformers from Baltimore to Ghent and, additionally, did not derive any revenues from the move of the transformers from Baltimore to Ghent. [R. 100 at 5–6 (citing R. 95-3 at 170–71).] As established, Blue Anchor is simply an arm of K+N AG. [R. 95-4 at 53.] K+N AG, K+N, Inc., and Blue Anchor, are wholly owned by K+N International AG. [*See* R. 94-1 at 4 fn. 6.] Generally speaking then, Blue Anchor and the other two K+N entities are each one horse in a team of horses driven by the same driver, K+N International AG. *Copperweld*, 467 U.S. at 771. Such a relationship between the entities is all too clear on the present facts, where all three worked together to complete the transportation of two transformers.[8] For certain legal purposes, the technical legal separateness of closely affiliated companies is meaningful, even where the companies have a complete unity of interest.

---

[7] Referring, seemingly, to the entity as a whole, not the separate German or U.S. entities.

[8] The definition of "Carrier's Agents" ("Carrier" is defined as Blue Anchor) within the Blue Anchor bill lends further clarity to the interconnectedness of the K+N entities. The definition states: "'Carrier's Agents' include but are not limited to the Kuehne + Nagel company which arranged the Carriage and/or issued this sea waybill and the Kuehne + Nagel company in the country where the Goods are discharged and/or delivered." [R. 94-3.]

However, for purposes of the present analysis, any distinction between Blue Anchor and K+N AG, either as it relates to arrangement of the transportation or payment terms, is not important.

Lastly, the Court notes that the conduct of K+N Inc., Progressive Rail, and CSX in arranging the specific terms of the rail leg of the transport is of limited probative value. Logically, to determine whether the initial bill of lading is a through bill, the conduct of the initial contracting parties, the Siemens entities and the K+N entities, is most noteworthy. The conduct of these initial parties indicates that the Blue Anchor bill was a through bill, as do the Blue Anchor bill's unambiguous terms. The subsequent agreement with a downstream carrier like CSX, as arranged by K+N Inc., does not impact the intent of the parties as manifested in the Blue Anchor bill. Indeed, "allowing such individual agreements to call into question the terms of the through bill of lading would seem to turn the industry practice on its head." *Royal SMIT Transformers BV v. Onego Shipping & Chartering, BV*, 898 F.3d 543, 553 (5th Cir. 2018).

The Court is unmoved by the simple fact that Siemens AG paid K+N AG, whereas Siemens Energy paid K+N Inc, in view of the following: the initial understanding that the K+N entities generally were to arrange the entire transportation; the closely-aligned goals and interests of the Siemens entities; and, importantly, the unambiguous terms of the Blue Anchor bill, which serve as a clear indication of the parties intent, devoid of any self-serving post hoc explanations. Consideration of the relevant factors results in a determination that the Blue Anchor bill is a through bill.

### 3

Consideration of the Supreme Court decision in *Kirby*, where the Court faced a similar procedural posture and similar factual circumstances, further bolsters the conclusion that the Blue Anchor bill is a through bill.

In *Kirby*, the cargo owner, Kirby Ltd., an Australian manufacturer, sold ten containers of machinery to the General Motors plant in Huntsville Alabama. 543 U.S. at 19. Kirby, Ltd. then hired International Cargo Control (ICC), an Australian freight forwarding company, to arrange for the delivery of the machinery. *Id.* "To formalize their contract for carriage, ICC issued a bill of lading to Kirby (ICC bill)." *Id.* The bill designated Sydney, Australia as the port of loading, Savannah, Georgia as the port of delivery, and, crucially, listed Huntsville, Alabama as the ultimate destination for delivery. *Id.* Further, the bill contained multiple provisions related to liability limitation. These provisions included a provision extending the liability limitations of COGSA to potential damage on land as well as sea and a Himalaya Clause extending the benefit of liability limitations in the bill to "all agents," including inland carriers and all independent contractors. *Id.* at 21.

Here, similarly, Siemens Energy agreed to sell machinery to Gallatin Steel in Ghent, Kentucky and contacted its parent company, Siemens AG, to effectuate that sale and, ultimately, delivery. Siemens AG then hired K+N AG to arrange for the delivery of the machinery. K+N AG, through an arm of its business, Blue Anchor, then issued a bill of lading to Siemens AG (the Blue Anchor bill). The bill designated Bremerhaven, Germany, as the port of loading, Baltimore, Maryland, as the port of delivery, and, crucially, listed Ghent, Kentucky as the ultimate destination for delivery. Further, as explained above, this bill contained multiple provisions related to liability limitation. These included a provision extending the liability limitations of COGSA to potential damage on land as well as sea, a provision by which Siemens Energy and Siemens AG made a Covenant Not to Sue, and a Himalaya Clause extending the benefit of liability limitations in the bill to all subcontractors, including rail transport operators.

Undeterred by the above similarities, Siemens Energy provides a list of factual distinctions between this case and *Kirby*. [R. 100 at 13.] Having found that the legal separateness of the Siemens entities and K+N entities is immaterial in this context, the sixth distinction, that in *Kirby* "[n]o other bill of lading was issued by [the railroad] for the overland carriage" is the only one that, on first glance, carries any weight. *Id.* However, as noted above, the Supreme Court in *Regal-Beloit* specifically noted the possibility that a carrier or subcontractor may unnecessarily issue the separate, domestic bill of lading. 561 U.S. at 103–04. This distinction, standing alone, is of limited value. *See G & P Trucking Co. v. Zurich Am. Ins. Co.*, 123 F. Supp. 3d 804, 808 (D.S.C. 2015). In all material respects, the factual circumstances surrounding issuance of the Blue Anchor bill, issued to formalize the agreement between K+N AG and Siemens AG,[9] are indistinguishable from the circumstances surrounding issuance of the through bill in *Kirby*. Moreover, the terms of the respective bills are similarly indistinguishable.

After consideration of the relevant factors and recent Supreme Court precedent, the Court determines that the Blue Anchor bill is a through bill. In making this determination, the Court makes clear that there is no genuine issue of material fact on this issue, simply a disagreement as to the legal significance of these facts. *See Hall Holding*, 285 F.3d at 424; *see also New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 410 (10th Cir. 1996) ("In this case, the parties do not dispute what happened, the dispute lies in what legal significance, if any, can be attached to the relevant events."). Accordingly, in line with the above analysis, this Court properly determines that the Blue Anchor bill is a through bill as a matter of law.

---

[9] Siemens Energy has not provided an explanation as to which documents constitute the final contract between the Siemens entities and K+N AG for the shipment arrangement. Its corporate representative did however acknowledge that the Blue Anchor bill was one of the documents that "govern[ed] this shipment." [R. 95-4 at 27–29.]

## C

The Blue Anchor bill is a through bill that, by its terms, applied for the duration of the transportation process. As such, the final determination in this case is the effect of the Blue Anchor bill's liability limitation provisions, specifically as it relates to the claims against CSX for alleged damages to the transformers.

Neither party disputes that the Blue Anchor bill is a maritime contract, as its primary objective is to transport goods by sea from Germany to the United States. *Kirby*, 543 U.S. at 16. Federal law therefore controls the interpretation of its terms. *Id.* at 22–23. In this specific area of law, the Supreme Court has instructed that maritime contracts "must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Id.* at 16. Thus, where the bill's terms are clear and unambiguous, those terms are to be given their plain and usual meaning. *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008). The Court will apply these well-established principles in interpreting the language of the relevant provisions concerning limitation of liability.

The effect of the Himalaya Clause and the Covenant Not to Sue in the Blue Anchor bill will be considered in tandem. The Himalaya Clause provides that every subcontractor, the definition of which included rail operators like CSX, "shall have the benefit of all provisions herein benefiting the Carrier" as if the bill was expressly for each subcontractor's benefit. [R. 94-3.] Pursuant the Himalaya Clause, CSX seeks shelter under the Covenant Not to Sue included in the Blue Anchor bill. [R. 94-1 at 26.] This provision provides that the "Merchant," the definition of which included both Siemens AG and Siemens Energy, agreed "that no claim or allegation shall be made against any Sub-Contractor whatsoever, whether directly or indirectly,

15

which imposes or attempts to impose upon any Sub-Contractor any liability whatsoever in connection with the Goods or the Carriage of the Goods." [R. 94-3.]

Like in *Kirby*, "the plain language of the Himalaya Clause indicates an intent to extend the liability limitations" in Blue Anchor bill broadly. 543 U.S. at 31. This includes the Covenant Not to Sue. Because the Blue Anchor bill is a through bill, via the Himalaya Clause, its provisions are applicable to subcontractors. This established, the Court is aware of no legal basis for invalidating the unambiguously drafted Covenant Not to Sue. The provision clearly provides "that no claim or allegation shall be made against any Sub-Contractor whatsoever" in connection with transportation of the transformers." [R. 94-3; *see also Nipponkoa Ins. Co. v. Norfolk S. Ry. Co.*, 794 F. Supp. 2d 838, 844 (S.D. Ohio 2011) (reaching the same conclusion when analyzing a similarly worded covenant not to sue).] The various documents and emails that were exchanged subsequent to the issuance of the through bill, including those between Progressive Rail, CSX, and K+N Inc., have no impact on the wide-ranging limitations of liability in the through bill. *See Royal SMIT Transformers BV v. Onego Shipping & Chartering, BV*, 898 F.3d 543, 553 (5th Cir. 2018) ("[D]ownstream carriers will come to specific agreements with the intermediary, but these agreements do not, in and of themselves, affect the terms of the Himalaya Clause in the through bill of lading. In other words, the contracts between downstream carriers and an intermediary do not impact the protections negotiated by that intermediary with the cargo owner.").

The use of Himalaya Clauses is a common means of shielding downstream carriers from liability. *See, e.g.*, *Royal SMIT Transformers BV v. HC Bea-Luna M/V*, No. CV 16-14647, 2017 WL 2364362, at *2 (E.D. La. May 31, 2017), *aff'd sub nom.*, 898 F.3d 543 (5th Cir. 2018) ("Generally, Himalaya Clauses—which are common—extend liability limitations benefitting

the common carrier to others acting as agents of the common carrier in the performance of the contract."). Sophisticated parties, like Siemens AG and Siemens Energy, remain free to adapt their contracts to remove such clauses. *See Kirby*, 543 U.S. at 36 ("Future parties remain free to adapt their contracts to the rules set forth here, only now with the benefit of greater predictability concerning the rules for which their contracts might compensate."). Here, however, they failed to do so, and this Court will not rewrite the terms of the through bill or ignore its plain directives. CSX is entitled to judgment as a matter of law that Plaintiffs' claims are barred pursuant to the Covenant Not to Sue included in the Blue Anchor bill.

### III

Siemens Energy is asking the Court to ignore both the unambiguous terms of the applicable bill of lading and the collaborative approach employed by the Siemens and K+N entities concerning the sale and transportation of the transformers. This the Court will not do. The Supreme Court's decision in *Kirby* expressly "provide[d] a legal backdrop against which future bills of lading [were] to be negotiated." 543 U.S. at 36. In arranging for transportation of the transformers, the Siemens entities may have ignored this legal backdrop, but the Court will not. The Blue Anchor bill is a through bill and CSX is entitled to protection pursuant to its limitation of liability provisions.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant CSX's Motion for Summary Judgment **[R. 94]** is **GRANTED**, consistent with the findings of this Order;

2. Plaintiff Siemens Energy's Motion for Partial Summary Judgment [**R. 96**] is **DENIED**; and

3.  This case is **STRICKEN** from the Court's active docket.

This the 10th day of March, 2020.

Gregory F. Van Tatenhove
United States District Judge